## 12307

### EX PARTE BENJAMIN HARRIS & CO., IN RE ATLANTIC COAST LINE R. CO. v. COLUMBIA SALVAGE CORP.

#### (140 S. E., 101)

1. Sales—Title to Scrap Passed from Seller, When Trust Company Issuing Letter of Credit Accepted Seller's Drafts With Negotiable Warehouse Receipts Attached.—Where settlement for purchase of brass cartridge shell scrap was to be by irrevocable letter of credit issued by a New York trust company in favor of seller and drafts were to be drawn thereon by seller not later than on named date, accompanied by negotiable warehouse receipts, title to scrap passed from seller when trust company accepted drafts drawn by seller and bearing indorsement that bill was secured by in-

dependent warehouse security conveying title to scrap stored in South Carolina.

2. Sales—Seller, Having Parted With Title to Brass Scrap, Had no Property in it Subject to Attachment.—Seller, having parted with title to brass cartridge shell scrap at time trust company accepted seller's drafts with negotiable warehouse receipts for scrap attached, had no property therein subject to attachment.

3. Sales—Transfer of Chattels May be Made Without Delivery, Where Delivery of Writing is Symbolical Delivery of Chattel.— Property and chattels may be transferred from one to another in writing without delivery; delivery of writing being symbolical delivery of property.

4. Warehousemen—Negotiable Warehouse Receipt, Drawn to Order and Attached to Draft to Order of Holder, is Same as Bill of Lading so Drawn.—A negotiable warehouse receipt drawn to order, attached to draft drawn to order of holder, has same effect as a bill of lading so drawn.

Before BONHAM, J., Charleston, April, 1926. Reversed with directions.

Action by the Atlantic Coast Line Railroad Company against the Columbia Salvage Corporation, in which Benjamin Harris & Co. intervened. From a judgment for plaintiff, the intervener appeals.

See, also, 138 S. C., 113; 135 S. E., 877.

*Mr. Nath. B. Barnwell,* for appellant, cites: *"Suspicion":* 28 L. R. A., 538; 37 Cyc., 652. *Suspicions do not make proof:* 14 S. C., 142. *Use of bankers acceptances recognized:* Sec. 3992, Civ. Code; U. S. Com. Stat., Par. 9796; 72 S. C., 450; 62 S. E., 625. *"Drafts":* 8 C. J., 40; 23 S. C., 339; Sec. 3777, Code; 72 S. C., 450; 62 S. E., 625. *"Acceptance":* Secs. 3783, 3713, 3790, Code; 192 N. Y., 499; Daniel, Neg. Inst. (5th Ed.), Par. 532; 103 S. C., 494; 37 S. C., 239. *When symbolic delivery of property sufficient to vest title:* 31 S. W., 24; 3 C. J., 948; 2 Hill, 587; 2 Strob., 309; 88 S. C., 558; 64 S. E., 1104. *When transfer of title becomes effective:* 5 S. C. L., 559; 17 S. C. L., 770; 1 McM., 76; 18 S. C., 521; 48 S. C., 272; 66 Ore.,

810; Sec. 3992, Code. *An attachment can only operate on the interests of the debtor; cannot affect interest of third party in any way:* 17 S. C., 120, 123; 96 S. E., 621; Drake on Attach., Sec. 234. *Court will protect against excessive attachment:* 500 S. C., 192; Harp., 219; 114 Atl., 460; Sec. 517, Code Civ. Proc. *Presumptions of law have no probative force:* 22 C. J., 124, 157. *Same; fade in the presence of fact:* 80 S. C., 321, 330; 105 U. S., 614, 617. *When acceptance completed by delivery it becomes absolute and irrevocable:* 37 S. C., 239; 8 C. J., 321; 114 N. Y. S., 308; 199 N. Y., 516; 63 N. Y. S., 58; 170 N. Y., 88. *Necessity to be advised of facts of a case before attempting to apply statements made by the Court as to the law:* 91 U. S., 618; 13 N. W., 151.

*Messrs. Fitzsimmons & Fitzsimmons,* for respondent, cite: *Where third party intervenes claiming to be owner of the attached property he must establish title upon that issue:* Sec. 508, Code Civ. Proc; 25 S. C., 467; 32 S. C., 320; 760 S. C., 349; 92 Am. Dec., 545. *Title must be regularly established by jury trial:* 17 S. C., 116; Id., 120. *Burden of proof upon intervener:* 32 S. C., 320. *Holder of warehouse receipts deemed to be owner of property covered thereby:* Sec. 3906, Code; 198 U. S., 530; 129 S. C., 58; 123 S. C., 353; 131 S. C., 81; 27 R. C. L., 970; 4 McCord, 294; 17 Am. Dec., 744; 24 R. C. L., 50. *Where sale of goods conditioned upon payment therefor, attaching creditor of buyer can acquire no greater right than that of seller:* 2 R. C. L., 863; 44 Am. Rep., 217; 24 R. C. L., 44; 91 Am. Dec., 366. *The holder of negotiable warehouse receipts is owner of property represented thereby and such property is liable to attachment issued against such holder as owner:* 23 S. C., 339; 123 S. C., 525. *Payment not mere acceptance of draft, affects the title:* 91 U. S., 618; 13 N. W., 151; 24 A. S. R., 618; 18 S. W., 115; 72 S. C., 450; 62 S. E., 625; 3 R. C. L., 1143; Sec. 3713, Code; 47 S.

W., 602; 84 A. S. R., 468; 115 S. C., 426; 125 S. C., 332, 341; 48 Am. Rep., 698; 50 Am. Dec., 385; 126 S. E., 753. *Uniform warehouse receipts act not adopted in South Carolina:* 51 Rep. Am. Bar Asso., 643, 646, 647. *South Carolina recognizes the right of attachment, execution, replevy, or other operation of law, without surrender of warehouse receipts:* Sec. 3907, Code; 27 R. C. L., 985; Id., 961, 962; 3 R. C. L., 89, 134; 103 U. S., 352. *Same, governs case at bar:* 12 Am. Dec., 468, 474. *When a third party intervenes in an attachment suit claiming ownership of the property attached, his only right is to have an issue framed to try that question of title:* Sec. 508, Code Civ. Proc; 25 S. C., 427; 17 S. C., 116, 120; 16 Am. Dec., 185; 99 Am. Dec., 719; 2 R. C. L., 883; 19 S. C., 527; 37 S. C., 102. *"Invited error":* 2 R. C. L., 56, 238, 239; 123 S. C., 399; 86 S. C., 62; 69 S. C., 460; 86 S. C., 8; 109 S. C., 160. *Insertion of matter in record:* 110 S. C., 534.

November 4, 1927.

The opinion of the Court was delivered by MR. ACTING JUSTICE R. O. PURDY.

Columbia Salvage Corporation, with its office in New York, had plants in the different parts of the country for salvaging war ammunition, and had a plant at Charleston. On April 13, 1922, an explosion occurred at this plant, resulting in damaging or destroying a large number of cars belonging to the Atlantic Coast Line Railroad Company, and the Railroad Company brought suit against the Salvage Corporation, claiming $35,000 as damages for the injuries done to its property, and on May 11, 1922, caused an attachment to be levied on the property of the Salvage Corporation at Charleston, and a part of this property consisted of a large number of brass cartridge cases.

Benjamin Harris & Co., of Chicago, dealing in property of this kind, intervened in the action which was pending between the Railroad Company and the Salvage Corporation,

claiming to be the owner of 1,000 tons of the cartridge cases.

The Railroad Company filed its answer, denying the title of the intervener. An issue was framed, in which was submitted to a jury the question whether the cartridge cases in question were legally the subject of attachment as the property of the Salvage Corporation on May 11, 1922, the date on which the cartridge cases were seized, and, the jury having answered in the affirmative, the intervener appealed.

At the conclusion of the testimony for the intervener, the Railroad Company made a motion for a nonsuit, which was refused, and at the conclusion of all the testimony, motions were made by the intervener and the Railroad Company for directed verdicts. Both of these motions were refused.

Title to the property claimed by the intervener rests upon the following alleged facts: On April 12th, Benjamin Harris & Co. purchased of the Salvage Corporation the property now claimed, by an agreement reached over the long distance telephone, conducted by Benjamin Harris, president of Benjamin Harris & Co., and Charles A. Levine, president of the Salvage Corporation, confirmed by a telegram and by a signed contract, all dated April 12th. Shipment was to be made after June 1st.

It was agreed that, in settlement, a letter of credit, irrevocable, should be arranged by the intervener with the New York Trust Company, to be issued by that company in favor of the Salvage Corporation, in the sum of $171,326.16, against which drafts might be drawn to that amount, not later than May 15th, the drafts to be accompanied with negotiable warehouse receipts of Charleston Port Terminal Warehouse, which had the property in storage, and a letter from the seller, guaranteeing payment of storage charges until June 1st and the payment of the expenses of loading.

This arrangement was made on May 8th by Mr. Harris, representing his company, with the New York Trust Company, and on the same date drafts were drawn by the Salvage

Corporation in favor of itself, and on May 9th, the New
York Trust Company accepted these drafts—six in number,
aggregating the sum authorized to be drawn for. On each
draft there was a signed acceptance, dated May 9, 1922,
and a further indorsement on each draft, signed by New
York Trust Company:

"This bill was secured at time of acceptance by independent
warehouse, terminal or other similar security conveying
security title to brass scrap stored in South Carolina, and
the acceptor will remain secured throughout the life of the
bill."

Each draft bore the indorsement of Columbia Salvage
Corporation, by Chas. A. Levine, president. The form of
the warehouse receipt is not material. It provided that the
property should be retained on storage, and delivered only
on surrender of the receipt, properly indorsed, with all
charges paid. There were four of these warehouse receipts.
They were delivered to the New York Trust Company by
the Salvage Corporation, duly indorsed, at the time that the
drafts were accepted. On May 12th, the Salvage Corpora-
tion procured the money on these drafts from the Manu-
facturers' Trust Company of New York, which was then
known as the Columbia Bank.

In behalf of the Railroad Company, its right to hold the
attachment is based upon the following alleged state of facts:
Joseph B. May was offered as a witness in behalf of the
intervener. He testified that he was auditor for the Salvage
Corporation in May, 1922, and it was his duty to keep a
record of the transactions of the corporation, and that he
carried through the transaction between the Salvage Cor-
poration and Harris & Co., and stated that he handled the
drawing of the draft. (Although several drafts were drawn,
it is referred to by the witness as a draft.)

"Q. When you got the acceptance of the draft, what
did you do with it? A. Why, we took the draft with the

warehouse receipts, and put them into our own bank for discount.

"Q. On what date was the draft discounted? A. On May 12, 1922.

"Q. These warehouse receipts for the brass shell cases were deposited with the draft, were they not? A. They were part and parcel of the draft."

The Railroad Company relies further, in support of its position, upon the following:

Mr. Wait, a witness for the intervener, was the general manager of the Charleston Port Terminal Company. He testified: That he was acquainted with Mr. Levine, the president of the Salvage Corporation, having worked for Mr. Levine at various places. That Mr. Levine was a self-made man, very cautious. That he would carry valuable papers around in his pocket for a week or ten days. That the first notice that the Port Terminal Company had that the property had been sold was when he got a letter from Mr. Levine, dated May 10th, received on May 12th. He said that inasmuch as the attachment was issued on the 11th of May, he though Mr. Levine had held back the mailing of the letter for 24 hours, and gives several reasons for his belief, stating that:

"Mr. Levine was always playing to get the last quarter of a cent out of this brass. I don't doubt he was carrying that letter in his pocket trying to get another quarter of a cent."

"I have no doubt the letter was written on the day it was typed" (on the 10th of May).

"What was your suspicion? A. I was suspicious of him and the letter. The letter was back dated to avoid some responsibility in the ownership of the brass."

It will be noted from these different statements of the witness that they are self destructive. He says he has no doubt it was written on the 10th, and then says it was back dated to avoid responsibility in the ownership of the brass,

and says that Mr. Levine was carrying it in his pocket to get a higher price for the brass. At most, these statements are mere matter of opinion and conjecture and have no probative force or value, as bearing on the issue; besides, the warehouse company had the property, which was ample security for its charges, and its contract was, under its receipts given, to deliver the property only on receipt of payment of all charges, and it was not necessary to give it any notice of change of ownership because its receipts had to be produced and all charges paid, and the act of Mr. Levine was a mere matter of courtesy, and the notice was given with reasonable promptness after the drafts were drawn against the letter of credit.

The whole matter is in a very narrow compass. If the property belonged to the Salvage Corporation on the 11th of May, then it had a right to dispose of it and it was the subject of attachment; if the property did not belong to it on that date, it could not be atached.

That the property was sold on April 12th and payment for it arranged on May 8th, consummated on May 9th, and the money actually obtained on May 12th is beyond question or controversy. The intervener in this case did not depend entirely on the possession of the warehouse receipts as evidence of ownership, but had a contract, first made by telephone, confirmed by telegram, and further evidenced by a contract in writing, duly signed, all on April 12, 1922.

If the Railroad Company had procured the receipts from the Salvage Corporation a different status would have arisen, but the testimony is undisputed that settlement would be made for the property purchased, by having the New York Trust Company accept drafts to the amount stated, upon getting a letter from the seller agreeing to pay the warehouse charges and the costs of loading, and upon getting the warehouse receipts; all of this was done. That it was done is recognized by the Railroad Company in this case, in the sixth

ground of its motion for a nonsuit, which ground is as follows:

"Benjamin Harris & Co. only had a letter of credit from the New York Trust Company, by which the New York Trust Company agreed to honor drafts of the Columbia Salvage Corporation at 90 days' sight, but the New York Trust Company only agreed to pay such drafts on surrender of the warehouse receipts, to be atached thereto; and the New York Trust Company, after accepting the drafts on May 9th, returned them, with the warehouse receipts attached, to the Columbia Salvage Corporation, who held the same on the date of the attachment so that the Columbia Salvage Corporation had both title and possession of the property at the time of the attachment, which is the only issue in this case."

There can be no dispute about the fact that the warehouse receipts were actually delivered to the New York Trust Company, and here is an express statement that such was done, but it is stated also, that:

"The New York Trust Company, after accepting the drafts on May 9th (and receiving the warehouse receipts) returned them with the warehouse receipts attached, to the Columbia Salvage Corporation."

The indorsements upon the drafts signed by the New York Trust Company stated that it had this security. The witness May testified that the drafts and the receipts were parts and parcels of each other, and it does not matter in whose possession the receipts came to be, they were impressed with the security for the payment of the accepted drafts, and the fact that they were used to assist in having the drafts discounted is shown by the fact that the New York Trust Company paid the drafts when due, and, as its contract was to honor the drafts upon the surrender of the warehouse receipts, they got the warehouse receipts when they paid the drafts.

It cannot be contended that the Salvage Corporation could have the property represented by the warehouse receipts and own the accepted drafts, too. It was not beneficially seized of the drafts in its own right after it had parted with title to them to the New York Trust Company, and on May 11th, it had no property in the shell cases which were the subject of attachment.

Property and chattels may be transferred from one to another in writing, without delivery, the delivery of the writing being symbolical delivery of the property. *Southworth v. Sebring,* 20 S. C. L. (2 Hill), 587.

It cannot be denied that a negotiable warehouse receipt, drawn to order, attached to a draft drawn to the order of the holder, is the same as a bill of lading so drawn. The respondent here contends that on May 11th, the Salvage Corporation, having the actual custody of the warehouse receipts, had the *jus disponendi* to the property, citing *Union Nat. Bank v. Rowan,* 23 S. C., 339; 55 Am. Rep., 26.

In that case, the bill of lading, with draft attached, drawn by the seller on the buyer, was discounted or purchased by the bank, and the purchaser attempted to attach the property as the property of the seller. After the indorsement and delivery of the bill of lading to the bank, it was held that this could not be done, because the transfer of the bill of lading passed title to the bank, and the respondent quotes further the language used by Mr. Justice McIver, as follows:

"It is not denied that the indorsement and delivery of the bills of lading to the plaintiff [bank] passed the title and right to the possession of the articles mentioned therein, * * * provided the transaction was valid and legal, and this having been done prior to the seizure under the warrant of attachment, the plaintiff would have a right to recover."

The respondent then seeks to make an application of the case of *Union Nat. Bank v. Rowan,* to this case, as follows:

29—S. C. 141

"So, here, the Columbia Salvage Corporation is holder of the warehouse receipts drawn to its order, with the drafts attached drawn to its order, had the title and right to possession of the property on May 11, 1922, and as the property was attached on May 11, 1922, while it had title and possession, the property was subjected to the lien of the attachment."

With great respect to the learning of the respondent's counsel, we think that the case of the bank against Rowan sustains the position of the intervener. The Salvage Corporation had indorsed and delivered the warehouse receipts to the New York Trust Company for the purpose of getting its accepted drafts in payment for the property which had been sold, *and had accepted these drafts as payment, just the same as if the money had been actually paid by the intervener.* Whether the New York Trust Company delivered back these receipts to the Salvage Corporation as a matter of convenience, to enable it to have the drafts discounted, or whether the Salvage Corporation required the drafts to be delivered as security for the acceptance, is immaterial; the New York Trust Company certainly did not make a gift of the warehouse receipts to the Salvage Corporation, and if that corporation had any interest in them at all, it was only for one of the two purposes above stated; it was not the owner on May 11th, and it could have held them and discounted the drafts at any time up to the time of maturity of the drafts, or it could have held the drafts without discounting them, and, presented them, at maturity, surrendering the warehouse receipts along with them, and have gotten the money; it certainly could not have gotten the money without delivering the receipts, and as before stated, it did get the money, and the drafts were paid in due course, and the receipts must have been attached to the drafts when they were paid.

Many cases are cited by counsel in support of the position taken by respondent. Among others, stress is laid upon

the case of *Davis v. Crozier & Co.,* 123 S. C., 525; 117 S.
E., 309, in which a third party intervened, claiming the at-
tached property, where it was held that it was incumbent
on the intervener and Crozier to show that Crozier had parted
with his title before the attachment was levied and that
they had failed to do so. The facts of that case are wholly
different from the case at bar. There the seller had shipped
oats under an order notify bill of lading, and had sold the
draft with the bill of lading attached to a bank; the buyer
refused to take the oats and the draft was returned unpaid, by
the bank, and was charged to the seller's account, but the
bill of lading was left with the bank under an agreement with
it on the part of the owner that the bank should take charge
of and sell the oats for the seller's account. It was properly
held that the shipment was subject to attachment by the
seller's creditors, as title to the oats had revested in the
seller.

Here, the accepted drafts were to be taken in payment
and the property was subject to shipment on June 1st, under
the contract and under an agreement between the parties.
After the attachment was levied, a part of the property was
released and shipped to the order of Harris & Co.

It was claimed by the intervener that property of the
value of about half a million dollars was attached, and that
this was excessive for the amount involved in this suit, and
one of the grounds of the intervener's motion for a directed
verdict was that the attachment was excessive, alleging that
property of over $500,000 in value had been attached in a
suit for $35,000. The intervener appealed also upon the
ground that irrelevant matter had been printed in the record
over the protest of its counsel, and counsel for the intervener
has urged the Court to make some further ruling on the
subject of printing needless extraneous matter in the record.

The Court has several times declared its position on this
subject and has penalized parties for its violation. In the
case, it is not necessary to pass on the question of whether

the attachment was. excessive in amount, nor is it necessary to pass on the other matters raised by the appeal, since the judgment below must be reversed.

On May 11, 1922, the property attached was not the property of Columbia Salvage Corporation, but was the property of Benjamin Harris & Co., the intervener, and it should have been so declared on the motion to direct a verdict in its favor. The exceptions alleging error on the part of his Honor in refusing to direct the verdict in favor of the intervener are sustained, the judgment below is reversed, and the case is remanded to the Circuit Court, with directions to enter up judgment in favor of the intervener on the issue raised and with leave to the intervener to take such other and further steps as may be necessary to carry into effect the judgment of this Court.·

Reversed.

Mr. Chief Justice Watts and Messrs. Justices Cothran, Blease and Stabler concur.